UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 15-cr-10338-FDS |
| | ) | |
| CARLOS MELARA | ) | |

<u>SENTENCING MEMORANDUM OF CARLOS MELARA</u>

The defendant Carlos Melara ("Mr. Melara") respectfully requests this Honorable Court sentence him to three hundred and sixty months (thirty years) in prison with five years of supervised release.  This sentence falls within both the Sentencing Guidelines and the binding Plea Agreement.  Perhaps more importantly, it recognizes the seriousness of the offense generally and Mr. Melara's conduct in particular.  It ensures Mr. Melara is significantly punished for his crime, and it deters similar conduct.  While nothing will bring back Wilson Martinez, thirty years in prison provides a measure of justice for him.  A thirty-year sentence also, however, recognizes that Mr. Melara was eighteen years old at the time of the offense.  It recognizes the immature, impulsive, and collective mentality that often accompanies youth, particularly where the group is tied together by shared language and life circumstances.  It also acknowledges Mr. Melara's acceptance of responsibility and provides, however far from now, an opportunity for a second chance at life.  In a case where loss, heartache, and despair so often overshadow everything else, it is frequently hard to see even a glimmer of light.  Three decades from now, as a much older man, in a footnote to this serious case, Mr. Melara hopes that a mature, contrite, and responsible version of himself might provide a much belated modicum of light.  We respectfully ask the Court for that opportunity.

<u>Sentencing Factors</u>

Pursuant to 18 U.S.C. § 3553(a)(1) through (7), the factors to be considered

1

when imposing a sentence include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to satisfy the statutory purposes of sentencing; the kinds of sentences available; the applicable guidelines; pertinent Sentencing Commission policy statements; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution.

<u>Personal History and Characteristics of Mr. Melara</u>

Mr. Melara was born on October 20, 1996 in La Reina, Chalatenango, El Salvador.  He is the youngest of nine children.  His parents, Jose Alfredo Gutierrez Ochoa and Irma Sara Melara, both about 60 years old, reside in nearby Tecomates, La Reina, El Salvador.  His father is a farm worker; his mother is a house cleaner.  The La Reina region is chronically poor, and events endemic to third-world poverty plague the area.  Mr. Melara, for instance, was previously diagnosed with tuberculosis.  Mr. Melara's sister, Lola, was born blind; she died when Mr. Melara was a boy.

In 2013, a teenage Mr. Melara traveled alone among dangerous passages across Central America and Mexico into the United States.  He left behind his parents and six of his living siblings.  His destination was Chelsea, MA where his thirty-five year old brother, Freddy Melara, had started a family and been living for a number of years.  Upon arrival, Mr. Melara moved in with Freddy, enrolled in Chelsea High School, and started work in local restaurants, including the Tijuana Restaurant in Chelsea and Cactus Grill in East Boston.  He also worked periodic construction and cleaning jobs.  This transition from El Salvador was unlikely to be easy, and it was not.  Mr. Melara had left his parents and closest siblings in La Reina.  Freddy, though welcome support, was considerably older than Mr. Melara and had not lived with the family for

years.  Mr. Melara was a teenager alone in a new country, unable to speak the language, and looking (consciously or not) for others who would accept him.  Extremely poor decisions resulted.

As he comes before the Court, however, Mr. Melara is not without personal insight and real capacity for change.  While he has no history of mental health treatment (unsurprising given his biography in El Salvador), Mr. Melara recognizes "that mental health treatment could be helpful for him in the future, as he thinks that talking to someone and learning about himself could be beneficial."  PSR ¶ 75.   While his substance abuse history is not overly extensive (a relative assessment), Mr. Melara acknowledges that his "pattern of alcohol use was problematic, and he is interested in pursuing substance abuse treatment."   Id. at ¶ 78.  He profoundly regrets that his son Patrick, born after his arrest and now two years old, will grow up with his father in prison, though he realizes why that must be the case.  See Id. at ¶ 71.  He misses his mother and speaks to her regularly, but still finds it hard to explain how he arrived in his present circumstances.  See Id. at ¶ 70.  Mr. Melara has emerged from childhood into young adulthood as both a father and a son, separated from his child and family, struggling to cope with his own actions.  While his facility for reflection is still developing, Mr. Melara's emerging insight and overall disposition promise growth and fuller realization.

<u>Mr. Melara has No Prior Criminal Convictions</u>

Mr. Melara has no prior criminal convictions.  Probation has given him a criminal history score of zero and placed him in Criminal History Category I.   Id. at ¶ 60.

<u>Mr. Melara will be Deported Upon Completion of Sentence</u>

Mr. Melara will be deported to El Salvador upon completion of his thirty-year sentence. He already has a warrant for removal pending.  Id. at ¶ 66.

<u>The Offense Conduct</u>

Mr. Melara has admitted responsibility to the charged offense.  He expressed his
willingness to resolve the case from a relatively early juncture and, on March 30, 2018, pled
guilty before the Court.

Mr. Melara's conduct in connection with the killing of 18th street gang member Wilson
Martinez (<u>Id</u>. at ¶ 28) on September 7, 2015 was, of course, remarkably serious.  No justification
can be offered, and none is offered here.  Mr. Martinez will be mourned by his family and loved
ones forever, a terrible consequence of this event.  A few points, however, are worth brief
mention.

First, neither the government nor probation suggest that Mr. Melara was aware of Mr.
Martinez's age at the time of the incident; moreover, neither the government nor probation
recommend a "victim related adjustment" for guidelines purposes.   <u>Id</u>. at ¶ 49.

Second, the government does not allege that Mr. Melara created the Facebook page or
even used the platform to contact Mr. Martinez in the months prior to the incident; in short, the
ruse employed to contact Mr. Martinez was not his idea.  <u>Id</u>. at ¶ 29.  Instead, Mr. Melara's direct
involvement stems from the night of the incident when he picked up Mr. Martinez on a scooter
and drove him to Constitution Beach.  <u>Id</u>. at ¶ 32, 37-39.

Third, while the PSR (and the Plea Agreement) recognize a two level "adjustment for
role in the offense" because Rene Mejia Flores was seventeen years old at the time of the
incident (<u>Id</u>. at ¶ 31; 50), Mr. Melara was only marginally older at eighteen years old.  Indeed, in
large measure Mr. Melara and Mejia Flores were similarly situated during the incident.  Both
teenagers used the scooter to retrieve individuals before the incident.  <u>Id</u>. at ¶ 31-32.  Both
teenagers were initially unarmed during the incident.  <u>Id</u>. at ¶ 33.  Both teenagers were told to

4

participate by more senior participants as the incident escalated.  Id. at ¶ 35; 38.  Both teenagers

were provided knives by those individuals.  Id.  While the adjustment is recognized, in practice

Mr. Melara and Mejia Ramos are more similar, developmentally and factually, than they are

different.

Fourth, while by no means dispositive in terms of culpability, it is worth noting that a

discrepancy exists as to who told Mr. Melara and Mejia Ramos, respectively, to participate in the

stabbing, and who provided them with knives.  As noted, both Mr. Melara and Mejia Ramos

were initially unarmed during the incident.  Id. at ¶ 33.  In a recorded statement to CW-1, Mr.

Melara stated it was Edwin Gonzalez who told him "Go, Chucho, its your turn," adding a detail

that Gonzalez wrapped the knife for him to use.  Id. at ¶ 38.   At Gonzalez's trial, however, Mejia

Flores testified that Gonzalez gave him (viz., Mejia Flores) that knife, and instead it was Henry

Josue Parada Martinez who gave Mr. Melara a knife.  Id. at ¶ 35.  Again, this factual discrepancy

in no way affects the ultimate fact of the crime; further, there is full agreement that Mr. Melara

used a knife that broke during the assault, with both parts of the knife being discovered near Mr.

Martinez and in the water, respectively.  Id. at ¶ 39-40.  Instead, this factual discrepancy

concerning who told Mr. Melara and Mejia Flores to participate in the stabbing, and who gave

the teenagers knives, is offered to show a lack of clarity surrounding this incident, particularly as

it escalated for the young, initially unarmed participants, Mr. Melara and Mejia Flores.

As it relates to the "additional conduct" from September 20, 2015 (added to the PSR

before release at ¶¶ 42a – 42d), it must be noted that Mr. Melara was never charged with the

murder of suspected 18th street gang member Irvin De Paz, nor does the Plea Agreement identify

such conduct.  Further, the government alleges through the PSR that Mr. Melara (along with Luis

Mario Cruz-Reyes) was involved in a chase with a different individual, Denys Perdomo

Rodriguez, at the time other defendants attacked Mr. De Paz.  No evidence suggests the man

stated to be Mr. Melara was armed and, moreover, Mr. Perdomo Rodriguez was not injured.

Respectfully, Mr. Melara objects to the inclusion of the "additional conduct" as a basis for

sentencing, and asks the Court to disregard it.

<u>Sentences of Other Defendants</u>

The sentences among defendants in this case vary, and the reason for such variation is

appreciable.  In requesting thirty years in prison, Mr. Melara requests more than some defendants

convicted of count two of the indictment, and less than others.  As a benchmark, however, Mr.

Melara respectfully suggests that he should be sentenced to fewer years than, for instance, Edwin

Diaz (Defendant 38), for whom the government agreed to a sentence recommendation of 420

months (thirty five years).  Dkt. No. 2643 at 1.

Of all the murders in this case, the government states "Diaz was involved in perhaps the

most horrific and heartless of those acts."  <u>Id</u>.  Diaz was one of four men who murdered 16-year

old Cristofer de la Cruz, "who was stabbed, hacked, and shot to death on a public street in East

Boston."  <u>Id</u>.  The individuals "lured [De la Cruz] to his death by pretending to be a girl."  <u>Id</u>. at

2.  "Diaz was one of three MS-13 members who stabbed the victim so many times that the victim

was left with 48 sharp force injuries, and they slashed the victim with such force that they

damaged the blades of their large knives on the victim's skull."  <u>Id</u>. at 1.  "Far from showing

remorse, Diaz was caught on tape bragging about the murder and wishing that he had been able

to do more, such as cut off the victim's head, but he was unable to do so because the gunshots

drew attention."  <u>Id</u>. at 1.  Diaz described how he had "zero mercy, zero, nothing" when he was

murdering De la Cruz.  <u>Id</u>. at 4.  Diaz also described the murder as "dicing" the victim "like

onions."  <u>Id</u>.  Diaz discussed how the murder "was awesome" and how he wanted to kill again,

stating, "I keep feeling that I want to kill another one." Id.   Diaz was recently eighteen years old at the time of the murder.  Id.

On these facts, Mr. Melara respectfully suggests he should not be sentenced to more prison time than Diaz.  First, though Diaz was younger than Mr. Melara by a matter of months, the two men were both eighteen years old.  Second, the two victims were of similar age, fifteen and sixteen, respectively.   Third, the same type of ruse, meeting a girl, was used in both incidents.   Fourth, the stabbing was sufficiently severe that knives were damaged in both cases. In these regards, the cases are particularly similar.

The difference in the cases, however, provides reason for the government's assertion that, of all the murders, "Diaz was involved in perhaps the most horrific and heartless of those acts." Dkt. No. 2643 at 1.  First, while there were many stab wounds in both cases, the Diaz murder had 48 sharp force injuries compared to a lesser 33 in this case.   Id.; PSR at ¶ 41.  Second, in addition to the more injurious stabbing, Diaz's confederate shot De la Cruz with a firearm multiple times during the murder.  Dkt. No. 2643 at 4.  Third, Diaz's gruesome desire to cut off the victim's head, his belief the killing was "awesome," his admission that he had "zero mercy, zero, nothing," and his craving to kill again, adequately explains the government's conclusion that "Diaz was involved in perhaps the most horrific and heartless" murder.  Id. at 1.

Comparing terrible murders is a terrible exercise.  The experience often feels like a race to the bottom.  Nonetheless, it must be said that the Constitution Beach murder, however horrible, involved fewer stab sounds, no shooting (and no innocent bystanders at risk), an initially unarmed defendant, and much less sordid satisfaction than the Diaz murder.  In the Diaz murder, the government recommended thirty-five years; on August 20, 2018, the Court

sentenced Diaz to that amount.  Dkt No. 2652.  While Mr. Melara requests a thirty-year sentence,

he respectfully suggests he should not be sentenced to more prison time than Edwin Diaz.

Mr. Melara's Conduct in Light of Scientific Evidence
Regarding Adolescent Brain Development

The Court is undoubtedly aware of the law and science surrounding adolescent brain

development and the "diminished culpability and greater prospects for reform" among juveniles.

See Miller v. Alabama, 567 U.S. 460, 471 (2012).  In Miller, the Supreme Court summarized its

jurisprudence as relying on "three significant gaps between juveniles and adults:"

> First, children have a "'lack of maturity and an underdeveloped sense of
> responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking.
> Second, children "are more vulnerable . . . to negative influences and outside
> pressures," including from their family and peers; they have limited "contro[l]
> over their own environment" and lack the ability to extricate themselves from
> horrific, crime-producing settings.  And third, a child's character is not as "well
> formed" as an adult's; his traits are "less fixed" and his actions less likely to be
> "evidence of irretrievabl[e] deprav[ity]."

Miller, supra at 481 (citations omitted).  The Court stressed that its decisions "rested not only on

common sense - on what 'any parent knows' – but on science and social science as well,"

describing those studies in detail.  Id.

While Mr. Melara was eighteen years old at the time of the incident, current science

suggests that his brain was structurally and functionally different than a mature adult brain.   See

Alexandra O. Cohen et al., When is an Adolescent an Adult? Assessing Cognitive Control in

Emotional and Nonemotional Contexts, 27 Psychological Science 549 (2016) (18 to 21 year-olds

experience "diminished cognitive performance under brief and prolonged negative emotional

arousal" compared to adults over 21); Steinberg L, Icenogle G, Shulman EP, et al. Around the

world, adolescence is a time of heightened sensation seeking and immature self-regulation,

Developmental Science 2017 ("Generally speaking, self-regulation develops linearly and

gradually over the course of adolescence, reaching a plateau somewhere during the mid-20s, whereas reward seeking follows an inverted U-shaped pattern, increasing between preadolescence and late adolescence, peaking at around age 19, and then declining as individuals move into and through their 20s.").  While Mr. Melara is certainly responsible for his actions, he was also subject to the requisite features of his cognitive development at eighteen years old.

The government has found it appropriate to consider the age of an eighteen year old in circumstances similar to the present case.  In the Diaz murder, for instance, the government appropriately wrote:

> [T]he government is mindful of the "distinctive attributes of youth," which include an "underdeveloped sense of responsibility" that makes youths vulnerable to "negative influences and outside pressures" and makes it difficult for them to "extricate themselves from horrific, crime-producing settings." Miller v. Alabama, 567 U.S. 460 (2012). Although courts have generally made these observations in cases involving the sentencings of juveniles, see, e.g., Miller and Roper v. Simmons, 543 U.S. 551 (2005), it is helpful to keep those principles in mind when crafting a discretionary sentence on an 18-year-old who was a juvenile when his fellow gang member(s) started planning the murder.

While Mr. Melara was marginally older than Diaz at the time of the respective murders, the brain development science reveals remarkably similar scenario for both eighteen year olds.  See e.g. Cohen et al, supra.  Mr. Melara respectfully requests the Court consider this similarity, and brain development science as a whole, in deciding his sentence.

Conclusion

This case offers few rays of light for those bound up in it.  There is no doubt that Mr. Melara deserves significant punishment for his crime, after which he will be deported from this country.  Thirty years in prison, the defendant respectfully suggests, is that significant punishment.  Not only is this sentence supported by the Sentencing Guidelines and the binding Plea Agreement, but it is commensurate with Mr. Melara's youth, brain development, life

circumstances, lack of prior criminal record, role in the offense, and a comparative review of sentences received by others.  The heartache of this case will never be overcome; thirty years from now, however, a modest postscript of transformation remains possible.  We respectfully ask the Court to sentence Mr. Melara to thirty years in prison as outlined in this Memorandum.

Respectfully Submitted,
CARLOS MELARA
By his attorney:

*/s/ David J. Grimaldi*
David J. Grimaldi
David J. Grimaldi, P.C.
BBO No. 669343
675 Massachusetts Avenue, 9th Floor
Cambridge, MA 02139
617-661-1529 (tel)
857-362-7889 (fax)
DATE: September 27, 2018                david@attorneygrimaldi.com

## CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this memorandum were served on all registered participants via CM/ECF this 27th day of September, 2018.

*/s/ David J. Grimaldi*
David J. Grimaldi